[No. 21748.   Department One.   March 26, 1929.]

WARD M. CARTER, *Respondent,* v. JEREMIAH WALKER
*et al., Appellants,* C. H. UNVERZAGT, *Defendant.*[1]

*Reynolds, Ballinger & Hutson* and *John T. Casey,*
for appellants.

*Wright, Froude, Allen & Hilen* and *Matthew W.
Hill,* for respondent.

TOLMAN, J.—Respondent, as plaintiff, instituted this
action for fraud and deceit, alleging in his amended
complaint that the defendants were, each and all,
trustees and officers of a corporation known as the
Northwest Company, and that, by fraudulently con-
spiring among themselves and by their conduct in pur-
suance of such conspiracy, they induced him to con-
vey to defendant Vogleson and his wife real property
of the value of $4,000 in exchange for certain bonds
of the Northwest Company, which were, and are,
worthless, and to advance certain money to, and for
the use of, the Northwest Company, which has not
been repaid, for all of which judgment was demanded.
Defendant Unverzagt was not served, and did not ap-

[1]Reported in 275 Pac. 730.

pear. The other defendants appeared, and answered separately, putting in issue substantially all of the allegations of the complaint.

The case was tried to the court, sitting without a jury, resulting in findings favorable to the plaintiff and a judgment against the three appearing defendants in the sum of $190 and interest, covering moneys advanced, and $3,000 as the value of real property exchanged for the bonds. The defendants have appealed.

The findings of fact made by the trial court follow rather closely the allegations of the amended complaint, and offer little help in arriving at an understanding of what effect any particular evidence had on the mind of the trial judge. We must therefore analyze the evidence, particularly that offered on behalf of respondent, for ourselves.

It appears that respondent was, at the time of trial, sixty-one years of age, had lived in Seattle for twenty years and was a bookkeeper by occupation; that, at the time in question, he, or the community composed of himself and his wife, owned the real property described in the complaint, consisting of a half acre tract of ground with a house on it. It was a long way out, and respondent's wife did not care to live there.

Respondent saw an advertisement in the daily paper, offering gilt-edged bonds for sale or exchange. He went to see defendant Vogleson, who was the advertiser, and was told by him that the bonds were issued by a mining company having a valuable lease on three miles of valuable placer ground in British Columbia, but apparently this was a sublease, and that defendant Unverzagt, whose connection therewith is not made very clear, was a man of advanced years, too old to work the property himself, though he had a million and a half dollars invested in it; that the defendant Walker had organized the Northwest Com-

pany, was the president of the company, and had secured for it a sublease covering three miles of the ground, and apparently Vogleson represented that the Northwest Company, through operations under this sublease, would have a wonderful opportunity for making a very large profit.

According to respondent, Vogleson also represented that Walker was a wealthy logger of Hoquiam, worth $200,000 or $300,000, and had already invested $10,000 in the Northwest Company; that the bonds issued by the Northwest Company were secured by a $600,000 bond of some sort, the nature of which he does not explain, and that these Northwest Company bonds would all be paid within five years, or less, from the profits derived from operating under the sublease, together with substantial bonuses.

At a subsequent meeting, according to respondent, Vogleson introduced him to a man by the name of Miller from Los Angeles, who, he said, had invested $100,000 in the property, and who had offered Unverzagt a million dollars for the purchase of it, but that Unverzagt was holding the property at $5,000,000. Respondent testified that Vogleson, at this second meeting, asked him to go and see the defendant Casey, who, he said, was the attorney for the Northwest Company.

A third meeting was had, according to respondent, in Mr. Casey's office in Seattle; Vogleson, Casey and the respondent being present. Respondent testified that Casey said he was the attorney for the Northwest Company; that Walker, who was reputed to be wealthy, was the president, but that Casey had no personal knowledge about Walker's wealth and apparently no personal knowledge of the mining property. Respondent testified:

"Casey said that he drew the Northwest Company's lease himself. He said that it was a very valuable

lease and explained how Walker had obtained it; that Unverzagt on account of his age, was not able to work the property and that Walker would be able to produce quick results. Casey said Walker was president and had invested more than $10,000.''

Respondent further testified:

''After a few days Vogleson called me up again and said Walker was in town. I met Walker in Casey's office. Vogleson was not present. . . . Walker said Unverzagt was an old man and they were going to finance and operate three miles of the ground; that it would finance itself in three months; that in five years the bonds would be all paid off and there would be a big bonus. Walker said he was satisfied all the bonds would be paid; that there was a $600,000 bond put up by the Mines Operating Company as security and as a basis for the Northwest Company's bonds.''

Respondent testified to another meeting in Casey's office, arranged by Vogleson, at which Walker was present. It does not appear whether Vogleson and Casey, or either of them, were present at that meeting. Respondent says Walker then told him that they were putting on a sales campaign to sell Northwest Company bonds and that Walker offered him $100 a month to take charge of the sales campaign in Seattle. Nothing appeared to be arrived at, at that meeting, and, at another meeting a week later, respondent says Walker offered to make him a trustee of the company if he would purchase at least $1,000 in bonds in addition to the $4,000 worth of bonds which he was to get from Vogleson. He testified:

''I said to Walker, 'You impress me as being an honest, fair man and that if you say trade, I will make the trade'. The lease was not yet consummated and he said wait and to not trade then. I went to work the next day. Walker said to go and get an office and report to Casey. . . . I paid the rent before I bought the furniture. Casey said, 'You pay the rent and

Walker will repay you'. I understood there was a special fund for the payment of those expenses. Walker told me there was after they hired me and that my salary would be paid. After a day or two Casey said 'If you will purchase furniture Walker will repay you'. I purchased a desk, rugs and chairs. I afterwards demanded repayment from Walker. Walker said there was no fund, and that we must sell the bonds first. This was two weeks before the transfer. I was waiting for Walker to say that the lease was perfected.''

As to a later meeting when the deed to the real property was executed, respondent testified:

''Walker was not there and Casey said there was nothing to prevent my trade with Vogleson then. My wife and I went up that morning. We met in the lobby of the Seattle Hotel. Walker said to go ahead with the trade, that everything was all right. Unverzagt and Walker were there before the trade was closed. Walker said 'I will see that you will be made a trustee'. This was the 25th of September, 1924. The deed was made to Vogelson's wife. Casey prepared it.''

On cross-examination, respondent testified that, so far as he knew, none of the defendants claimed ever to have seen the mining property except Mr. Walker; that Vogleson never told him that he had any personal knowledge of it; that Casey never represented to him that he had any personal knowledge regarding the property or its value, and he did not, at the time, think that Casey had ever seen it; that he knew Mr. Walker was the president of the Northwest Company, but had no knowledge of any other defendant ever having been an officer or trustee of that company. It appears from the deed offered in evidence that respondent and his wife deeded their real property to Bessie L. Vogleson, the wife of appellant Vogelson, and that he knew that the Voglesons wanted to raise money by a mortgage on the property immediately

after the transfer, and attempted to assist them in doing so; that he went personally to examine the mining property before the deed was delivered; that, when he was there, he learned that a receiver had been appointed for the Lightning Creek Company, the owner of the property,

"   .  .  . but Mr. Unverzagt and the other defendants made me think there was nothing serious about the receivership. I turned my property over to the Voglesons after I knew a receiver was appointed for the Lightning Creek Company."

On re-direct examination, referring to the mortgaging of the property by the Voglesons, respondent testified:

"They were trying to negotiate a loan. Casey told me he was to get $1,000; that Vogleson and Unverzagt owed him a lot of money and he had signed a note of $270 as surety for Vogleson. Casey asked me if I could get a loan for Vogleson. He was to get $1,000 and I understand Unverzagt was to get the balance."

There was some corroboration of respondent, but mostly as to immaterial matters and circumstances which were entirely consistent with fair dealing. It will be observed that respondent made no attempt to prove the falsity of the representation that a lease had been made to the Northwest Company, that a $600,000 bond had been made by the Mines Operating Co. to secure the Northwest Company's bonds, that Walker had invested $10,000 in the enterprise, or that Walker was reputed to be wealthy.

The defendants, of course, denied any conspiracy, any deceit, fraud or misrepresentation, and each told what appears on paper to be a fair story, entirely consistent each with the other, and all tending to show that Mr. Walker, when first advised of the pending trade, urged respondent not to make the trade, as it would be of no use to the Northwest Company, and

would bring no money to its treasury to prosecute operations under the sublease.

There is nothing tending to show that Walker, in any way, profited from the transfer of the property, or that Casey did, except, as already stated and as Mr. Casey testified, that Vogleson was indebted to him and did pay him $300, perhaps as much as $400, out of the money he secured from mortgaging the property.

It seems apparent that, so far as Walker is concerned, there is nothing upon which to base even an inference that he profited directly or indirectly by the trade, and any representations made by him were either known to be untrue before the trade was consummated, or are not even now shown to have been untrue. As to Casey, the evidence that he was to, and did, receive money raised by Volgleson by mortgaging the property, is perfectly consistent with good faith and fair dealing, and his representations, so far as material, are not shown to have been untrue by any evidence offered on behalf of the respondent. Of course the defense offered what appears to be reasonable and plausible justifications and explanations as to any representations which were made. As we read the testimony, Vogleson, who was, by fair inference, the agent of Unverzagt, and Unverzagt himself, are the only ones to whom actionable fraud can be traced.

Since fraud is never presumed, but must be established by at least a fair preponderance of the evidence, we cannot say, taking it at its best, that the respondent's testimony will support a judgment against anyone, save the defendant Vogleson, for the value of the real property traded.

There is sufficient evidence to support the court's finding as to the $190 advanced by the respondent for the use of the Northwest Company, but we cannot find that the respondent has sustained the burden of

proof, as to the main item, against appellants Walker and Casey, and therefore the judgment for $3,000, as against them only, must be reversed.

The judgment in its entirety against Vogleson is affirmed. The judgment for $190 and interest, as against appellants Walker and Casey, is affirmed, but the remaining part of the judgment for $3,000 is, as to them only, reversed.

Appellants Walker and Casey will recover their costs on this appeal.

MITCHELL, C. J., HOLCOMB, FULLERTON, and BEALS, JJ., concur.